IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:18-CR-144-D

UNITED STATES OF AMERICA      )
                              )
        v.                    )         **ORDER**
                              )
ENIL RAMON MONTOYA VELASQUEZ, )
                              )
                Defendant.    )

On August 28, 2018, a federal grand jury charged Enil Ramon Montoya Velasquez ("Velasquez" or "defendant") with five felonies arising from his alleged drug trafficking. See [D.E. 15]. On July 22, 2019, Velasquez pleaded guilty to distribution of a quantity of cocaine on or about February 26, 2018 (count two), distribution of a quantity of cocaine on or about March 2, 2018 (count three), and possession with intent to distribute a quantity of cocaine on or about July 9, 2018 (count five), and not guilty to counts one and four. See [D.E. 39]. On May 29, 2020, a jury convicted Velasquez of conspiracy to distribute and to possess with intent to distribute 500 grams of more of methamphetamine and a quantity of cocaine from a date unknown, but no later than on or about July 1, 2014, to on or about July 9, 2018 (count one), and distribution of 50 grams or more of methamphetamine on or about July 9, 2018 (count four). See [D.E. 71, 72]. At trial, Velasquez claimed that he was a cocaine dealer, but not a methamphetamine dealer.

On October 16, 2020, Velasquez moved for a new trial based on newly discovered evidence [D.E. 100]. See Fed. R. Crim. P. 33(b)(1). Velasquez contends that the government's failure to produce a memorandum that the lead case agent prepared on May 15, 2020, concerning the agent's interview of Armondo Figueroa ("Figueroa") on May 4, 2020, violated Brady v. Maryland, 373 U.S. 83, 87 (1963), and warrants a new trial. See [D.E. 100] 5–9. Figueroa testified at trial, and

Velasquez contends that if he had the memorandum concerning Figueroa's May 4, 2020 interview, then the memorandum "would have undermined [Figueroa's] credibility" and "likely resulted in a verdict of not guilty" on counts one and four concerning methamphetamine. Id. at 9. Velasquez asks the court to vacate the jury verdict of May 29, 2020, and order a new trial. Alternatively, he seeks an evidentiary hearing. See id.

On December 16, 2020, the government responded in opposition. See [D.E. 110]. The government argues that its failure to disclose the memorandum did not violate Brady because the memorandum was not exculpatory or impeaching. See id. at 11–17. Alternatively, the government argues that the memorandum is not material under Brady. See id. at 17–19.

After evaluating the withheld memorandum in light of the entire trial record, the court finds that the memorandum was impeaching but not material under Brady. See Turner v. United States, 137 S. Ct. 1885, 1893–95 (2017). Velasquez received a fair trial, and the verdict is worthy of confidence. Accordingly, the court denies Velasquez's motion for a new trial.

## I.

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). Ordinarily under Rule 33, when a defendant seeks a new trial based on newly discovered evidence,

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

2

United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987). When a Brady or Giglio violation forms the basis of a Rule 33 motion, however, "the proper legal standard is more favorable to the defendant than that identified in Bales" because the Brady standard does not require a defendant to prove that non-disclosed evidence probably would have resulted in an acquittal. United States v. Cohn, 166 F. App'x 4, 12 (4th Cir. 2006) (per curiam) (unpublished); see United States v. Bartko, 728 F.3d 327, 337–41(4th Cir. 2013); United States v. Sutton, 542 F.2d 1239, 1242 n.3 (4th Cir. 1976).

To prove a Brady violation, Velasquez must prove three things: "(1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense." United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011); see Bartko, 728 F.3d at 338. Under Brady and its progeny, a defendant is entitled to a new trial based on the government's non-disclosure of exculpatory or impeachment evidence if the defendant establishes a reasonable probability that with the favorable evidence the defendant would have obtained a different result at trial. See Turner, 137 S. Ct. at 1893; Smith v. Cain, 565 U.S. 73, 75–77 (2012); Strickler v. Greene, 527 U.S. 263, 296 (1999); Bartko, 728 F.3d at 340; United States v. Robinson, 627 F.3d 941, 951–53 (4th Cir. 2010); United States v. Cargill, 17 F. App'x 214, 227 (4th Cir. 2001) (per curiam) (unpublished). Although less rigid than the defendant's burden under Rule 33, this standard remains challenging. See Bartko, 728 F.3d at 337–41; Cargill, 17 F. App'x at 227–31; Sutton, 542 F.2d at 1242 n.3.

The parties agree that the government failed to disclose the May 15, 2020 memorandum concerning Figueroa's May 4, 2020 interview until after the trial and before the sentencing hearing. Accordingly, because Velasquez did not have the memorandum for use at trial, the court must evaluate whether the non-disclosed memorandum was exculpatory or impeaching and, if so, whether

3

the memorandum is material. See Turner, 137 S. Ct. at 1893; Smith, 565 U.S. at 75–77; Kyles v. Whitley, 514 U.S. 419, 436–37 & n.10 (1995); Bartko, 728 F.3d at 340; United States v. Ellis, 121 F.3d 908, 916–18 (4th Cir. 1997). In doing so, the court must keep in mind that the fundamental inquiry under Brady's materiality standard is whether the court has confidence in the outcome of the trial. See Turner, 137 S. Ct. at 1893; Smith, 565 U.S. at 75–76; Kyles, 514 U.S. at 434; United States v. Bagley, 473 U.S. 667, 682 (1985); Bartko, 728 F.3d at 340; Higgs, 663 F.3d at 735.

## II.

The court has evaluated the withheld memorandum in light of the entire trial record, including all the testimony and the exhibits. During his opening statement, the Assistant United States Attorney ("AUSA") outlined that the government's evidence would concern a drug investigation in 2018 in Sampson County, North Carolina, including the use of a confidential informant, Armondo Figueroa ("Figueroa"), to make controlled purchases of cocaine from Velasquez on February 26, 2018, and March 2, 2018, and to purchase methamphetamine from Velasquez on or about July 9, 2018. The AUSA also outlined that on July 9, 2018, law enforcement recovered the methamphetamine from Figueroa and arrested Velasquez shortly after Velasquez received $5,200 in cash from Figueroa to purchase the methamphetamine. When law enforcement arrested Velasquez, he possessed $5000 of the buy money for the methamphetamine, multiple cell phones, a large amount of additional U.S. currency, multiple passports, and cocaine packaged for sale. The AUSA forecast that other evidence, including witness testimony and recorded calls and text messages from Velasquez's phone and Figueroa's phone, would corroborate the methamphetamine transaction of July 8 and 9, 2018. See [D.E. 107] 24–30. The AUSA forecast that the jury would hear from the lead investigative agent ("Agent Fann" or "Fann") and Figueroa, and learn about miscommunication between the English-speaking Fann and the Spanish-speaking Figueroa about

4

when Figueroa received the methamphetamine. See id. at 29.

In defense counsel's opening statement, he conceded that Velasquez sold cocaine to the Figueroa on February 26, 2018, and March 2, 2018, and that Velasquez pleaded guilty to the three charges associated with his cocaine dealing. See id. at 30. Defense counsel forecast that the government would not be able to prove that Velasquez sold methamphetamine to Figueroa on July 8 or 9, 2018, and that the evidence would show that Figueroa's statements to law enforcement about the alleged methamphetamine transaction were conflicting and not believable. See id. at 30–33. Defense counsel also forecast that, before trial, Velasquez disclosed to the government an alibi defense for Velasquez's whereabouts on the morning and early afternoon of Monday, July 9, 2018. According to defense counsel, due to the alibi defense, Figueroa then changed his story in the days leading up to trial and belatedly claimed that Velasquez delivered the methamphetamine to him on the evening of Sunday, July 8, 2018, instead of the morning or early afternoon of July 9, 2018. Defense counsel opined that the jury would not be satisfied with the explanation of Figueroa and Fann as to when Velasquez allegedly delivered the methamphetamine to Figueroa. Defense counsel also forecast that the defense would present an alibi witness for July 8, 2018, who would testify that Velasquez came to her residence during the afternoon of July 8 and remained there into the evening, including when Figueroa now claimed that Velasquez delivered the methamphetamine to him. See id. at 33–36.

During the trial, the government presented seven witnesses and the defense presented two witnesses. Agent Fann testified about the 2018 investigation of Velasquez. The investigation included using confidential informant Figueroa. See id. at 36–44. Figueroa is a native of Puerto Rico who came to North Carolina in 2012. See [D.E. 91] 4. When Figueroa moved to North Carolina, Figueroa was married to Belinda Rodriguez ("Rodriguez"). See id. at 5. Figueroa and

5

Rodriguez lived on Corinth Church Road in Salemburg, North Carolina. See id. at 6; Gov't Ex. 37. Figueroa used a room in his house as a barber shop. See [D.E. 91] 7. After experiencing back problems, Figueroa became addicted to oxycodone. See id. at 8. When he could not obtain oxycodone legitimately, he began using heroin and dealing drugs. See id. at 8–9.

Figueroa met Velasquez in early 2014. See id. at 10. Figueroa was Velasquez's barber. Velasquez (who was in the United States illegally) asked Figueroa if Figueroa would put Velasquez's cars on Figueroa's insurance policy in return for having Velasquez pay to insure not only Velasquez's cars but also Figueroa's cars. See id. at 11–12. As their relationship grew, Figueroa began to observe Velasquez's drug dealing. See id. at 12. Specifically, at a restaurant named Las Brasas, Figueroa acted as a middleman for certain cocaine transactions. See id. at 12–15. People who did not know Velasquez would approach Figueroa and ask for cocaine. See id. Figueroa in turn, would speak to Velasquez, and Velasquez would give the cocaine to Figueroa. Figueroa, in turn, delivered the cocaine to "the client" and made "some money." Id. at 15. The cocaine sales took place in 2015, 2016, and 2017 and usually involved half an ounce or an ounce of cocaine. See id. at 16.

After Las Brasas closed, Figueroa and Velasquez began going to another restaurant named Los Amigos. See id. at 16–17; Gov't Ex. 100. The owner of Los Amigos was more strict than the owner of Las Brasas, but Velasquez and Figueroa also used the same process to sell cocaine at Los Amigos. See [D.E. 91] 17. Figueroa also purchased cocaine from Velasquez at one of Velasquez's residences. See id. at 19–20.

In February 2018, Agent Fann spoke to Figueroa about becoming a confidential informant. See [D.E. 107] 44–45. Fann knew that Figueroa was a convicted felon and a drug dealer. Figueroa agreed to become a confidential informant and signed a cooperation agreement with the Sampson

6

County Sheriff's Office ("SCSO") dated February 16, 2018. See id.; Gov't Ex. 109. The SCSO (including Fann) then used Figueroa as a confidential informant in various drug investigations, including an investigation of Velasquez. See [D.E. 107] 46. As a confidential informant, Figueroa gave the SCSO access to his phone and his residence, and the SCSO paid him. See [D.E. 91] 22–23.

After agreeing to cooperate, Figueroa told Fann that Velasquez had supplied Figueroa with cocaine for approximately three to four years. See [D.E. 107] 47. Fann communicated with Figueroa in "broken English." Id. The SCSO does not have a Spanish translator on staff, but some deputies are bilingual and assist with translation when they are available. See id. at 47–48.

The government presented evidence of two controlled purchases of cocaine, one on February 26, 2018, and the other on March 2, 2018. Specifically, on February 26, 2018, Figueroa and Velasquez texted each other about Figueroa purchasing cocaine from Velasquez. See id. at 48–59; [D.E. 91] 23–25; Gov't Exs. 1–8, 11–16. Figueroa arrived at Velasquez's residence and waited for Velasquez. See [D.E. 91] 26. After Velasquez arrived, Velasquez sold cocaine to Figueroa, and Figueroa videotaped the transaction. See id. at 26–28; Gov't Ex. 9. Figueroa left and took the cocaine to law enforcement. See [D.E. 91] 28. On March 2, 2018, using the same process, Figueroa made another controlled purchase of cocaine from Velasquez. See id. at 28–31; Gov't Exs. 24, 26. The evidence of these two controlled purchases included text messages between Velasquez and Figueroa, the cocaine that Figueroa purchased from Velasquez, the recordings of the buys, and still photographs of the buys. See Gov't Exs. 2–6, 9–16, 21–26.[1]

From March 2, 2018, until July 2018, the SCSO used Figueroa in about 40 other

---

[1] As mentioned, on July 22, 2019, Velasquez pleaded guilty to distribution of a quantity of cocaine on each of these dates. See [D.E. 39]. Those charges were contained in count two and count three of the indictment. See id.

investigations involving other people. See [D.E. 107] 59. On Friday, July 6, 2018, Figueroa texted Fann and said, "Enil have kilo ice" "2 pound" "Ice." Gov't Ex. 31; see [D.E. 91] 32. Fann responded, "Where?" "Yo?" Gov't Ex. 31; see [D.E. 91] 32. Figueroa replied, "Him call me imagino don't know" "Him just trade seller" "One kilo" "Him drive with honda accord." Gov't Ex. 31; see [D.E. 91] 32. Fann responded, "Ok." Gov't Ex. 32. Figueroa replied, "Him around clinton," texted Fann a picture of a black package that Velasquez sent to Figueroa, and said, "The honda have black rims." Id.; see [D.E. 91] 32.

Due to the holiday weekend, Fann told Figueroa to delay the methamphetamine purchase until Monday, July 9, 2018. See [D.E. 91] 33; [D.E. 107] 60–66. Velasquez and Figueroa texted extensively about the methamphetamine deal from Friday, July 6, 2018, until Monday, July 9, 2018. See [D.E. 91] 34–40; Gov't Ex. 34. Velasquez's phone identified Figueroa as "Bori Barber." Gov't Ex. 65; see [D.E. 91] 34. Figueroa testified that his nickname was Bori Barber because he was a barber from Puerto Rico. See [D.E. 91] 34.

Figueroa explained the text exchanges between Figueroa and Velasquez from July 6, 2018, to July 9, 2018, concerning the methamphetamine sale. See id. at 34–40; Gov't Exs. 66–77, 101-66–101-75. On Friday, July 6, 2018, Figueroa texted Velasquez and said, "Hey dude send me a picture my buddy doesn't believe me." Gov't Ex. 101-66; see [D.E. 91] 34–35. Velasquez responded with a photo of a black package which Figueroa believed was a package containing methamphetamine. See Gov't Ex. 101-66. Figueroa asked, "How much is it Price." Id.; see also Gov't Exs. 32, 55, 66. Velasquez replied, "$5500 each pound" "At least $5400." Gov't Ex. 101-67. Figueroa asked, "And for the sale" "And how much do I earn." Id. Velasquez replied, "$200 per pound." Id. Figueroa responded, "For both." Id. Velasquez replied, "$400." Id. Later that day, Velasquez wrote, "Let's meet" "In person" "Now" "Where are you I'll see you at your house."

8

Gov't Ex. 101-68. Figueroa responded, "Okay let me leave work" "And we'll meet at the house." Id.; see [D.E. 91] 35–36. Velasquez told Figueroa, "Okay I don't want to go around everywhere with this." Gov't Ex. 101-70. Notwithstanding the text about trying to meet on July 6, 2018, Figueroa and Velasquez did not meet on that date. See id.; [D.E. 91] 36–37; Gov't Ex. 101-71.

On Saturday, July 7, 2018, Figueroa and Velasquez continued to text about the methamphetamine deal. See Gov't Exs. 101-70–101-71; [D.E. 91] 37. Velasquez expressed frustration at Figueroa for not answering his phone. See Gov't Exs. 101-71–101-72. At 4:03 p.m., Velasquez asked for Figueroa's address. See [D.E. 91] 37; Gov't Ex. 101-72. Figueroa responded, "108 corinth church rd. salumber." Gov't Ex. 101-72. Velasquez, however, did not go to Figueroa's residence on Saturday, July 7, 2018.

According to Figueroa, on Sunday, July 8, 2018, Figueroa and Velasquez continued to text about the methamphetamine deal. See id.; [D.E. 91] 38. At 1:57 p.m., Velasquez wrote Figueroa and said, "I'll see you later on I just have to drop off my girls." Gov't Ex. 101-73. At 7:55 p.m., Figueroa wrote to Velasquez and said, "Asshole" "Are you going to keep screwing around." Id. At 8:03 p.m., Velasquez wrote, "I'm here I was on a call" "Where do I meet you." Id.; see [D.E. 91] 38–39.

Between 8:03 p.m. and 9:23 p.m. on Sunday, July 8, 2018, Velasquez arrived at Figueroa's residence in a Honda Accord. See [D.E. 91] 39, 49. Velasquez approached the carport. See id. at 49. Figueroa came out of the residence and his wife, Rodriguez, did too. See id. After small talk about Velasquez's car, Rodriguez went into the residence. See id. at 49–50. Velasquez then got the black package out of his Honda Accord, and Velasquez and Figueroa entered the residence. Once inside the residence, Velasquez gave Figueroa the black package containing the methamphetamine. See id. at 50.

9

After Velasquez left the residence, Figueroa opened the black package in the room in the house that he used as a barber shop. See id. at 50–51. Figueroa described the black tape and grease on the package, and how he unwrapped it. See id. at 51. Figueroa identified the ziplock bag of methamphetamine inside the black package. See id. After Figueroa opened the package, Rodriguez came into the barber shop, saw the black tape in the trash can, saw the drugs, and became upset. See id. at 51–52. Figueroa told Rodriguez that he was working with the police and would give the drugs to the police on Monday, July 9, 2018. See id. at 52.

Rodriguez corroborated Figueroa's testimony about the methamphetamine delivery. See [D.E. 108] 15–28. Rodriguez knew Velasquez because Velasquez was one of Figueroa's customers at Figueroa's barber shop and because Velasquez occasionally would visit their house. Rodriguez knew that Figueroa was involved in dealing drugs and believed Velasquez was as well. See id. at 18. According to Rodriguez, Velasquez came to their residence on July 8, 2018, at approximately 8:00 or 9:00 p.m. See id. at 17–22. Velasquez arrived in his Honda, got out, and began speaking with Figueroa in the carport. Rodriguez approached them and spoke to Velasquez about the weekend and his car. See id. at 19–20.

Rodriguez entered the residence. See id. at 20. Figueroa and Velasquez did too. See id. Figueroa and Velasquez went into the barber shop together and remained in that room for about 20 to 30 minutes. See id. While Rodriguez was in the kitchen, Velasquez left. See id. at 20. Rodriguez then went to the bedroom. See id. at 20–21.

Rodriguez left the bedroom and entered the barber shop. See id. She noticed a big ball of greasy black tape in the trash can. See id. She asked Figueroa about the tape. See id. at 21. Figueroa said the tape was from the package that Velasquez brought him. See id. Figueroa then showed her the methamphetamine. See id. Rodriguez told Velasquez to get the drugs out of her

10

house. See id. at 21–22. Figueroa told Rodriguez to calm down and that he was working for the police. See id. at 22.

At 9:23 p.m., Figueroa texted Velasquez and said, "This isn't a kilo." Gov't Ex. 101-73. Velasquez replied, "No it's 16 ounces" "One pound." Id. At 10:52 p.m. Figueroa texted Velasquez and said, "I need you to get somebody that you trust to watch that and I go looking ounce by ounce Belinda is scared it's a lot" "I'll get it out for you." Gov't Ex. 101-74.

At 8:59 a.m. on Monday, July 9, 2018, Fann texted Figueroa and said, "Wake up." Gov't Ex. 36; see [D.E. 91] 52. Figueroa responded that he was going to court, that his friend Mario would have access to his phone, and that it was dangerous to text him. See [D.E. 91] 52–53. Fann decided to wait to hear from Figueroa because Fann knew Mario was another drug dealer.

At 10:58 a.m., Figueroa texted Velasquez and said, "The dude's got 5200 cash." Gov't Ex. 101-74. Velasquez immediately responded, "Ok" "All right." Id. Figueroa said, "Now." Id. Velasquez replied, "Ok." Id.

At 12:57 p.m., Figueroa texted Fann and said, "Yo him left half kilo my house becouse him go durhan" "Is crasy" "Never call me" "Him say him come back pic up money." Gov't Exs. 35–36. Fann responded to Figueroa and said, "You by self" "Call me." Figueroa replied, "No mario whit me and my son." Gov't Ex. 35; see [D.E. 107] 65–66. Fann responded, "I need the dope" "Now." Gov't Ex. 34. Figueroa replied, "Ok were you want meet me" "Sent spot." Id. Fann responded, "I got to get from your house." Id. Figueroa replied, "Mario is here" "Bro." Id. Fann responded, "Ditch Mario." Id. Figueroa replied, "You otw now" "How clo[]se." Id.

At approximately 1:20 p.m. on July 9, 2018, Figueroa met Fann at a church near Figueroa's residence, and Figueroa gave the methamphetamine to Fann. See [D.E. 107] 66–68; Gov't Exs. 37–39. Figueroa told Fann his son and Mario were at Figueroa's residence. See [D.E. 107] 68.

11

Fann and Figueroa agreed to meet later that afternoon. See id. at 68–69.

At approximately 3:15 p.m. on July 9, 2018, Figueroa, Fann, and other law enforcement officials met at a safe location to arrange Figueroa's delivery of the $5,200 in buy money to Velasquez. See id. at 71. Between approximately 3:36 p.m. and 6:36 p.m., Figueroa made five controlled telephone calls to Velasquez concerning the methamphetamine sale. See [D.E. 91] 54–58; Gov't Ex. 110. In the first call, Figueroa told Velasquez that he had a buyer for the other pound of methamphetamine. See Gov't Ex. 110 (Filename 49-1). Velasquez responded that he already had reached a deal to sell the other pound, but would evaluate who had the money first. See id. In the second call, Figueroa again asked to buy the second pound of methamphetamine. See id. (Filename 49-2). Velasquez responded that he was driving to deliver the second pound to another customer, but if the customer was not ready with the cash, then he would sell it to Figueroa. See id. In the third call, Figueroa told Velasquez that he had the money to pay for the first pound and the second pound. See id. (Filename 49-3). Velasquez responded that his buyer for the second pound also had the money and that he needed to keep his word to his other customer. See id. In the fourth call, Figueroa asked where Velasquez was. See id. (Filename 49-4). Velasquez responded, "I'm here about to deliver that to you," but then the call failed. Id. In the fifth call, Velasquez and Figueroa discussed where to meet for Figueroa to deliver the money to Velasquez for the methamphetamine. See id. (Filename 49-5). Velasquez suggested the Walmart parking lot in Clinton. See id. Figueroa agreed. See id.; [D.E. 91] 58; Gov't Ex. 52. Velasquez said that he would arrive in about 15 minutes. See Gov't Ex. 110 (Filename 49-5).

Between 11:00 a.m. and 6:56 p.m., Velasquez and Figueroa also continued to text about the methamphetamine deal. See Gov't Exs. 101-74–101-75; [D.E. 91] 45–46. At 3:20 p.m., Velasquez texted Figueroa and said, "I'm on the way where I was is far away." Gov't Ex. 101-75. At 5:33

12

p.m., Figueroa responded, "What did you do with the other one" "Do you have it." Id. Figueroa was referring to the other pound of methamphetamine. At 5:47 p.m., Velasquez replied, "Hold on I'm here at my friend's place." Govt' Ex. 101-76. Between 5:58 p.m. and 6:56 p.m., Figueroa texted Velasquez and said, "Where fool" "Fool I'm here already." Id. Velasquez replied, "On my way." Id.; see [D.E. 91] 47–48.

As Velasquez had suggested, Figueroa delivered the money for the methamphetamine to Velasquez in the Walmart parking lot in Clinton. Figueroa recorded the delivery of the buy money to Velasquez. See [D.E. 91] 58–59, 65; Gov't Exs. 50–55. At approximately 7:10 p.m., Figueroa delivered the money to Velasquez in Velasquez's car, and Velasquez counted the money. See [D.E. 91] 59. Velasquez also opened his glove compartment to reveal a large amount of additional U.S. currency. See id. at 60; Gov't Ex. 84. Figueroa then asked Velasquez when Velasquez was going to get more ice, and Velasquez responded that he would get more ice once he delivered the money. Velasquez paid Figueroa $200 for delivering the buy money and arranging the one pound methamphetamine transaction. See [D.E. 91] 61.

Law enforcement recorded Figueroa's delivery of the buy money. See Gov't Exs. 49–54; [D.E. 107] 72–75. Multiple agents observed Figueroa deliver the buy money to Velasquez in Velasquez's car in the Walmart parking lot. See [D.E. 107] 75. After the exchange, Figueroa exited Velasquez's car and got into his own car. See id. Some agents followed Figueroa to the safe location. See id. at 75–76. Other agents conducted a traffic stop of Velasquez's car leaving the Walmart parking lot. See id. at 76.

Captain Joseph Frischman of the SCSO conducted the Velasquez traffic stop. See [D.E. 108] 44–59. After Figueroa exited Velasquez's car in the Walmart parking lot, Velasquez drove out of

Case 7:18-cr-00144-D   Document 114   Filed 04/14/21   Page 13 of 28

the Walmart parking lot. See id. at 47. Frischman initiated a traffic stop, and Velasquez pulled over. See id.

Frischman approached Velasquez's car and spoke to him in English and asked for his driver's license and registration. See id. at 48. Velasquez responded that he did not have a driver's license and handed Frischman a Mexican identification card with the name Edwin Ramirez Bardales. See id.; Gov't Ex. 95. Frischman knew the identification was false. See [D.E. 108] 48–49. Frischman asked Velasquez to step out of the car, and Velasquez complied. See id. at 49. After Velasquez consented to a search of his person, Frischman recovered a large sum of U.S. currency from Velasquez's pocket. See id. Velasquez spontaneously told Frischman that he worked construction and had just gotten paid. See id.

Frischman told Velasquez that he had a question about his name and needed to run it through the computer in Frischman's police vehicle. Frischman asked Velasquez to join him in the police vehicle, and Velasquez did so. See id. at 49–50. While in the police vehicle, Velasquez told Frischman that he lived in a hotel and had recently separated from his wife. See id. at 50. Frischman again asked him where he lived, and Velasquez pointed at the fake Mexican identification card that listed the address for Edwin Ramirez Bardales as 51 Piano Lane, Roseboro, North Carolina. See id.

At that point, a canine officer arrived and walked his dog around Velasquez's car. See id. The dog alerted to the presence of narcotics in Velasquez's car. After the dog alerted, Frischman asked Velasquez if there was anything illegal in the car, and Velasquez said no. See id. at 50–51. Officers then searched the car. See id. Officers located a water bill with the name Enil Velasquez, and an officer gave the bill to Frischman. Frischman ran that name in the computer. See id.

While searching Velasquez's car, officers located more than just the water bill. See id. at 51–57; Gov't Exs. 77–86, 90–91, 93–94, 96. Velasquez's car contained a plastic baggy with

14

individual baggies of suspected cocaine (Gov't Exs. 78, 82), a black Samsung cellphone (Gov't Ex. 79), a baggy of suspected cocaine (Gov't Ex. 80), $5,000 in U.S. currency under the driver's seat (Gov't Ex. 81) (i.e., the buy money less $200), $171 in U.S. currency in the compartment beneath the radio (Gov't Ex. 83), $10,355 in U.S. currency in the glove compartment (Gov't Ex. 84), 23 Honduras passports and a plastic baggy with suspected cocaine (Gov't Exs. 85, 86, 93), a black Samsung cell phone in the door pocket of the car (Gov't Ex. 90), and an envelope and tag documents in the trunk (Gov't Ex. 94). See [D.E. 108] 50–56. Officers also recovered a silver iPhone from Velasquez. See Gov't Ex. 91. After the search, Frischman confirmed Velasquez's identity and arrested him. See [D.E. 108] at 57–58.

On July 9, 2018, after Figueroa delivered the buy money and returned to the safe location, Fann met with Figueroa to retrieve the text messages between Figueroa and Velasquez on Figueroa's cell phone for the period July 6 to July 9, 2018. See [D.E. 107] 76; Gov't Exs. 55–64. After the search of Velasquez's car, Fann also obtained copies of text messages between Figueroa and Velasquez from one of Velasquez's cell phones for the period July 6 to July 9, 2018. See [D.E. 107] 77–78; Gov't Exs. 65–76, 101.

On July 12, 2018, Fann interviewed Figueroa without an interpreter. See [D.E. 107] 78–80. Agent Crystal Gore ("Gore") accompanied Fann. See id. at 110.[2] After the interview, Fann wrote a report stating that Figueroa said Velasquez delivered the methamphetamine to Figueroa on July 9, 2018. See id. at 79–80. Fann wrote the report based on his understanding of what Figueroa told him and Fann's understanding of the text message that Figueroa sent to Fann at 12:57 p.m. on July 9, 2018. See id. at 80; Gov't Ex. 36. During the interview, Fann specifically asked Figueroa if

---

[2] Gore did not testify at trial due to a medical condition.

Velasquez had come to Figueroa's residence on July 8, 2018, and Figueroa said no. See [D.E. 107] 110–14. Based on the evidence gathered to that point, Fann believed that Velasquez had delivered the methamphetamine to Figueroa on July 9, 2018.

On May 15, 2020, Figueroa, the AUSA, and a translator met at the U.S. Attorney's office to prepare for trial. By that time, Fann and the AUSA knew that Velasquez planned to offer an alibi defense for the morning and early afternoon of July 9, 2018. Fann asked Figueroa to use the interpreter and copies of all the text messages and explain what happened with the methamphetamine and when it happened. See id. at 82, 130–34. Figueroa went through all the text messages with the interpreter and told Fann and the AUSA that Velasquez delivered the methamphetamine to him on Sunday, July 8, 2018, between 8:03 p.m. and 9:23 p.m. See id. In support, Figueroa specifically cited Government Exhibit 101-73 and pointed to the time period between receiving a text from Velasquez at 8:03 p.m. on July 8, 2018, and responding to Velasquez at 9:23 p.m. Velasquez's 8:03 p.m. text stated, "I'm here I was on a call" "Where do I meet you." Gov't Ex. 101-73. Figueroa said that, after receiving that text, he met with Velasquez at his house, and Velasquez gave him the methamphetamine. Velasquez then left. At 9:23 p.m., after Velasquez had left Figueroa's house, Figueroa texted Velasquez and said, "This isn't a kilo." Id. At 9:24 p.m., Velasquez responded, "No, it's 16 ounces" "One pound." Id. Fann testified that his earlier misunderstanding of Figueroa was due to the language problems between the English-speaking Fann and the Spanish-speaking Figueroa. See [D.E. 107] 85–86. The AUSA immediately disclosed this impeaching information to the defense. See id. at 133.

Javier Castillo ("Castillo") testified. Castillo is a translator. See [D.E. 108] 30. After describing his education, training, and experience, Castillo explained forensic translation. See id. at 30–37. He then authenticated his translation of the recorded telephone calls between Velasquez

16

and Figueroa concerning the methamphetamine deal. See id. at 38, 40–43; Gov't Ex. 110. He also authenticated his translation of the text messages from Figueroa's phone and Velasquez's phone concerning the  methamphetamine deal. See [D.E. 108] 38–40; Gov't Exs. 65–76 (text messages in Spanish); Gov't Ex. 101 (text messages in Spanish translated into English).

DEA Task Force Agent Anthony DiGiovanni ("DiGiovanni") offered opinion testimony concerning methamphetamine trafficking. See [D.E. 108] 60–79. DiGiovanni explained the difference in appearance and production of methamphetamine and crystal methamphetamine. See id. at 63–65. DiGiovanni also explained that dealers usually sell crystal methamphetamine in pound quantities and that, unlike cocaine which is organic and can be compressed into a "brick," crystal methamphetamine is non-organic and cannot be compressed into a brick. See id. at 65–66.

DiGiovanni discussed how some drug dealers will "front" or advance crystal methamphetamine to a customer and receive payment after delivering the crystal methamphetamine. See id. at 67. He also discussed code words that drug dealers often use to disguise what they are actually discussing. See id. DiGiovanni opined that drug dealers often package methamphetamine in multiple plastic bags with tape and grease to mask any odor and to prevent recovery of fingerprints. See id. at 68–69; Gov't Ex. 87 (actual methamphetamine); cf. Gov't Ex. 32 (photograph of alleged methamphetamine in a black package sent from Velasquez's cell phone to Figueroa's cell phone); Gov't Ex. 55 (same); Gov't Ex. 66 (same).

DiGiovanni discussed the prices of cocaine and methamphetamine in Eastern North Carolina in 2018. In 2018, an ounce of cocaine cost approximately $1,000 to $1,300 and a pound of methamphetamine cost from $4,000 to $6,000. See [D.E. 108] 69–70. He also explained how between 2015 and 2018, the market in Eastern North Carolina was flooded with methamphetamine,

17

and the price of methamphetamine dropped from $10,000 to $13,000 a pound in 2015 to $4,000 to $6,000 a pound in 2018. See id.

DEA Forensic Chemist Victoria Broadstreet ("Broadstreet") testified about the methamphetamine that she analyzed in this case. See [D.E. 87] 3–9; Gov't Exs. 87, 107. Broadstreet explained that the methamphetamine had a net weight of 454.4 grams and was 98% pure, yielding a weight of pure methamphetamine of 445.3 grams. See [D.E. 87] 8–9; Gov't Ex. 107. The court also received laboratory reports concerning the cocaine. See Gov't Exs. 102–107. Before the government rested, the court advised the jury of defendant's plea of guilty to the cocaine charges in counts two, three, and five. See [D.E. 108] 77–78.

Spencer McInvaille ("McInvaille") testified for the defense. See id. at 79–89. McInvaille specializes in digital forensics and cellular location analysis. See id. at 81–82. McInvaille testified that he analyzed two of Velasquez's cell phones (an iPhone X and Samsung J3), but could not identify where the two cell phones were located between 8:00 p.m. and 9:30 p.m. on July 8, 2018. See id. at 83–87.

Elisa Benegas ("Benegas") also testified for the defense. See [D.E. 80] 3–33. Benegas has known Velasquez for about eight years. See id. at 4. Benegas would cook at her house and host meals. Friends (including Velasquez) would attend the meals and eat and pay for their food. See id. at 4–5. Benegas also hosted a similar regular Sunday meal where she served soup. See id. at 5–6. According to Benegas, Velasquez arrived at her house on July 8, 2018, at around 2:00 p.m. and did not leave until after midnight. See id. at 7. During the meal, Velasquez acted as a disc jockey and was in charge of using the computer in the kitchen to play music. See id. at 7–8.

On cross examination, Benegas stated that she never saw Velasquez with drugs and did not know he was a drug dealer. See id. at 10–11. Benegas also testified that she could not remember

18

the names of the other six people who attended the soup meal on July 8, 2018. See id. at 14–18. Benegas also admitted that Velasquez could have left the kitchen for some period of time on July 8, 2018, without her knowing about it. See id. at 31–32.

III.

Velasquez cites as Brady material the memorandum that Fann prepared on May 15, 2020, concerning Fann's interview of Figueroa on May 4, 2020. Velasquez argues that "[i]f the prosecutor had disclosed the May 4, 2020 CI interview notes before trial, defense counsel could have cross examined [ ] Agent Fann and the CI regarding that interview raising the issue of witness credibility and perhaps exculpatory evidence." [D.E. 100] 7. According to Velasquez, if he had this memorandum, he could have proven Figueroa's lack of credibility and created "reasonable doubt about who allegedly delivered the methamphetamine" on July 8 or 9, 2018, which "likely" would have resulted in "a not guilty verdict" on the methamphetamine counts. Id. at 8. Accordingly, Velasquez asks the court to vacate the jury verdict and grant a new trial. See id. at 9. Alternatively, Velasquez asks the court to hold an evidentiary hearing to collect and preserve evidence necessary to review Velasquez's request for a new trial. See id.

At Velasquez's sentencing hearing, Fann testified about the memorandum of May 15, 2020, and the interview of Figueroa on May 4, 2020. See [D.E. 113] 13–16. Fann testified that he interviewed Figueroa on May 4, 2020, without an interpreter. See id. Fann wrote the memorandum on May 15, 2020. See id.; [D.E. 100-2] (copy of memorandum). The memorandum reads in full:

1.  On May 4, 2020, [redacted] met with CI 2018-0200 at the Sampson County Sheriff's Office (SCSO) [redacted], CI 2018-0200 spoke with agents about Enil VELASQUEZ.

2.  The CI stated he/she had known VELASQUEZ since 2014. The CI stated VELASQUEZ sold cocaine and [sic] the Las Brasas restaurant in Clinton, NC.

19

3.      Agent's Notes:  Las Brasas was located at 416 Warsaw Road, Clinton, NC. Las Brasas is currently closed for business.

4.      The CI stated that VELASQUEZ sold cocaine at Las Brasas in 2014, 2015, and 2016. The CI stated he/she always saw VELASQUEZ at Las Brasas with 1/2 ounce to ounce of cocaine.

5.      The CI stated he/she was not a "middle man" for VELASQUEZ, but stated individuals would contact to [sic] the CI and ask for cocaine and he/she would send the individuals to VELASQUEZ.

[D.E. 100-2].

Paragraph five of the memorandum is favorable to Velasquez because it is impeaching. After all, on direct examination, Figueroa testified that he was a middleman for Velasquez in 2015, 2016, and 2017 concerning cocaine sales at Las Brasas.  See [D.E. 91] 15–16.  Specifically, Figueroa testified that when someone needed cocaine and did not know Velasquez, the person would speak to Figueroa.  See id. at 15. Figueroa, in turn, would speak to Velasquez, get the cocaine from Velasquez, deliver the cocaine to the customer, and Figueroa would make some money.  See id. Thus, the government should have produced the memorandum to the defense for use at trial.  See, e.g., Smith, 565 U.S. at 76; Bartko, 728 F.3d at 338; Higgs, 663 F.3d at 735; United States v. Wilson, 624 F.3d 640, 660–61 (4th Cir. 2010).

Because the memorandum is favorable and was not disclosed, the court must decide whether the memorandum is material.  Under Brady's materiality standard, a defendant is entitled to a new trial based on the government's non-disclosure of impeachment information if the defendant establishes a reasonable probability that with the favorable evidence the defendant would have obtained a different result at trial.  See, e.g., Turner, 137 S. Ct. at 1893; Smith, 565 U.S. at 75–76; Cone v. Bell, 556 U.S. 449, 469–70 (2009); Kyles, 514 U.S. at 434; Bartko, 728 F.3d at 340. Velasquez argues that if he had been able to use the undisclosed memorandum to cross examine

20

Fann and Figueroa, then the result of the trial concerning Velasquez's methamphetamine convictions on count one and count four would have been different. See [D.E. 100] 7–9. According to Velasquez, the additional impeachment evidence in the May 15, 2020 memorandum would have resulted in a different verdict on the methamphetamine counts. See id.

The court has evaluated the withheld evidence in light of the entire trial record and finds that this additional impeachment evidence is not material. See Turner, 137 S. Ct. at 1893–95; Bartko, 728 F.3d at 337–41; Ellis, 121 F.3d at 917–18; United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir. 1995); United States v. Rawle, No. 90-6255, 1991 WL 22836, at *4 (4th Cir. May 6, 1991) (per curiam) (unpublished table decision). Notably, defense counsel's entire cross examination of Agent Fann focused on Figueroa's alleged lack of credibility, particularly as to the alleged methamphetamine delivery on July 8, 2018, and Figueroa allegedly changing the delivery date from July 9, 2018, to July 8, 2018, in order to defeat Velasquez's alibi for the morning and early afternoon of July 9, 2018.

On cross examination, Fann described the investigation of Figueroa's drug dealing in 2017 and 2018 that preceded Figueroa becoming a confidential informant. See [D.E. 107] 88–90. In February 2018, Fann approached Figueroa to see if Figueroa would become a confidential informant. See id. at 91–94. On February 16, 2018, Figueroa agreed to cooperate and signed a cooperation agreement. Figueroa then told Fann about eight to ten people who were dealing drugs, but did not initially include Velasquez's name. See id. at 96–97. In a second meeting, Figueroa identified Velasquez as a drug dealer and a source of cocaine for Figueroa. See id. at 98. Fann also testified that Figueroa was on probation when he cooperated, and the SCSO paid him for cooperating. See id. at 98–100.

Defense counsel had Fann review the report that Fann wrote in July 2018 about the events of July 6 to 9, 2018. See id. at 107. In the report, Fann wrote that Velasquez delivered the methamphetamine to Figueroa's house on July 9, 2018. See id. at 108. Fann testified that he wrote that in the report because that is what he understood Figueroa to have told him. See id. Moreover, according to Fann's report, at 1:20 p.m. on July 9, 2018, Figueroa told Fann that Velasquez was going to Durham. See id. at 109. Furthermore, according to Fann's report, at 3:15 p.m. on July 9, 2018, Figueroa told Fann that Velasquez had come to Figueroa's house to drop off the methamphetamine and would return from Durham on that day to pick up payment. See id.

Defense counsel had Fann admit that, on July 12, 2018, Fann met with Figueroa. See id. at 110. Agent Gore accompanied Fann, but they did not bring an interpreter. See id. During the interview, Fann specifically asked Figueroa if Velasquez had come to his house on July 8, 2018, and Figueroa said no. See id. at 110–14.

Defense counsel had Fann acknowledge that, before trial, Fann learned that Velasquez planned to offer an alibi for the morning and early afternoon of July 9, 2018. See id. at 114. Fann testified that he, the AUSA, and the interpreter met with Figueroa on May 15, 2020, which was after the government learned about Velasquez's alibi for the morning and early afternoon of July 9, 2018. See id. at 114–15. Fann did not record the meeting of May 15, 2020. See id. at 115–16. During that meeting, Figueroa used the text messages and the translator to explain that Velasquez delivered the methamphetamine to him at his residence on July 8, 2018, at between 8:03 p.m. and 9:23 p.m. See id. at 116.

Defense counsel asked Fann about Figueroa's criminal history. Fann admitted Figueroa was a felon and was on probation. Defense counsel also had Fann admit that Figueroa impermissibly kept $200 of the $5,200 buy money after paying Velasquez. See id. at 116–21. Fann also admitted

22

that Figueroa initially lied about receiving the $200 when Fann confronted him about it. See id. at 121–23. Fann also admitted that the SCSO stopped using Figueroa as a confidential informant after July 9, 2018, because Figueroa improperly kept the $200 that Velasquez had given him and lied about it and because Figueroa's identity as a confidential informant may have been known to non-law enforcement personnel. See [D.E. 108] 13–14.

Defense counsel did not limit his attack on Figueroa's credibility to the cross examination of Fann. On cross examination of Frischman, Frischman testified that it would not be appropriate for a confidential informant to open a package of suspected drugs. See id. at 58. Defense counsel also had Rodriguez admit that her husband, Figueroa, took Percocet pills that were not prescribed to him. See id. at 24–25.

Defense counsel's attack on Figueroa's credibility concerning the methamphetamine deal continued during his closing argument. Defense counsel framed his entire closing argument with one question: "[C]an you believe the informant?" [D.E. 109] 24. Defense counsel then explained all the reasons that the jury should not believe Figueroa's testimony that Velasquez delivered a pound of methamphetamine to him on July 8, 2018, and that the $5200 payment on July 9, 2018, was for that methamphetamine. See id. at 24–59. Defense counsel gave the jury 18 reasons not to believe what Figueroa said about the methamphetamine transaction. Those reasons included: (1) Figueroa was a heroin dealer until becoming a cooperating informant on February 16, 2018 (see id. at 25–26); (2) Figueroa did not identify Velasquez as a drug dealer in his first debriefing with Fann (see id. at 26); (3) Fann never testified about any communication problems with Figueroa on Figueroa's 39 other cases where Figueroa cooperated (see id. at 27); (4) Fann understood Figueroa's 12:57 p.m. text of July 9, 2018, to mean that Velasquez had just dropped off the methamphetamine at Figueroa's residence (see id. at 27–28); (5) Fann understood Figueroa to have told him at 1:20

23

p.m. on July 9, 2018, that Velasquez was going to Durham and would return later that day to collect the money for the methamphetamine (see id. at 28); (6) Fann understood Figueroa to have told him at 3:15 p.m. on July 9, 2018, that Velasquez had dropped off the methamphetamine and was coming back that day to pick up the money for the methamphetamine (see id. at 28–29); (7) Fann had a bilingual officer review the July 9, 2018, texts to confirm that the methamphetamine delivery was on July 9, 2018 (see id. at 29); (8) on July 12, 2018, Figueroa told Fann and Gore that Velasquez dropped off the methamphetamine on July 9, 2018, and had not come to his house on July 8, 2018 (see id. at 30); (9) Figueroa "changed his story" after Velasquez gave a notice of alibi concerning the morning and afternoon of July 9, 2018 (id. at 31–32); (10) Figueroa violated the rules of a pain management clinic in 2014 and got expelled (see id. at 32); (11) Figueroa became a drug addict in 2014 and began selling drugs in 2014 to feed his habit (see id.); (12) Figueroa is a felon who was convicted in 2017 of felony possession with intent to sell and deliver heroin and was on probation (see id.); (13) Figueroa hid his drug addiction from Rodriguez, who testified that he did not have drug problem from 2014 to 2017 (see id. at 33); (14) Figueroa improperly kept $200 of the buy money that Velasquez allegedly paid him on July 9, 2018 (see id. at 33–34); (15) Fann confronted Figueroa about the missing $200, and Figueroa lied to Fann and said he kept $20 for gas (see id. at 34); (16) Figueroa then told Fann that he got $200 as payment for his work, but that was not true because Fann said that informants are not paid out of buy money (see id. at 34–35); (17) Figueroa then told Fann that the $200 was hidden in Figueroa's car, but that was not true because Figueroa ultimately admitted that he spent the $200 (see id. at 35); and (18) the SCSO stopped using Figueroa as an informant after July 9, 2018, in part because Figueroa lied to Fann about the $200 (see id. at 36).

24

Defense counsel then explained in his closing argument why he did not ask Figueroa a single question on cross examination. See id. at 43–44; cf. [D.E. 91] 68 (defense counsel stating that "I have no questions" in response to the opportunity to cross examine Figueroa). He stated:

> All this evidence that I've described, most of it presented by the Government, shows the informant to be dishonest. I didn't ask any questions because . . . he's going to come up with another excuse about why the four or five different times he told the agents on the 9th and the 12th that the delivery was on the 9th, and not until 20 months later does he change the story to the 8th after I presented all this evidence that [Velasquez] could not have been to the informant's home on the 9th.

[D.E. 109] 43–44. Defense counsel then extolled the credibility of the defense alibi witness about Velasquez's whereabouts on July 8, 2018 (see id. at 44–53), questioned the credibility of Belinda Rodriguez about her memory of July 8, 2018, (see id. at 47), and argued to the jury that Velasquez's guilty plea to cocaine dealing in counts two, three, and five showed that Velasquez will admit his guilt when he is guilty (i.e., I am a cocaine dealer) but not admit his guilt when he is not guilty (i.e., I am not a methamphetamine dealer). See id. at 53–55.

Figueroa was an important witness concerning the methamphetamine object in the conspiracy charge in count one and the methamphetamine distribution charge in count four. Nonetheless, the May 15, 2020 memorandum concerning the May 4, 2020 interview of Figueroa is cumulative impeachment evidence. See, e.g., Turner, 137 S. Ct. at 1894–95; Bartko, 728 F.3d at 338–41; Ellis, 121 F.3d at 917–18; Hoyte, 51 F.3d at 1243. Even if defense counsel had the memorandum, the impeachment value would have related solely to a few more questions directed at Fann, where defense counsel could have had Fann admit that during the meeting on May 4, 2020, Figueroa admitted to dealing cocaine with Velasquez, but declined to call himself a middleman. Velasquez, however, already pleaded guilty to distributing cocaine to Figueroa on February 26 and March 2, 2018, and admitted that he possessed the cocaine in his car on July 9, 2018, with an intention to

Case 7:18-cr-00144-D   Document 114   Filed 04/14/21   Page 25 of 28

distribute it. Thus, that line of questioning would have resulted in 19 arguments during closing argument as to why Figueroa was not credible as to the methamphetamine transaction instead of 18 arguments. Moreover, the government's "no translator present" response would have been the same response that the government would have used to that "new" 19th argument. Furthermore, nothing suggests that if defense counsel had the May 15, 2020 memorandum concerning the May 4, 2020 interview, then defense counsel would have cross examined Figueroa about it. Cf. Turner, 137 S. Ct. at 1894–95 (holding that evidence supporting a new trial strategy is not material when there is otherwise substantial evidence of defendant's guilt and the alleged new trial strategy would not have overcome that substantial evidence of guilt); United States v. Madori, 419 F.3d 159, 169–70 (2d. Cir. 2005) (same).

The mountain of other evidence against Velasquez concerning the methamphetamine object in count one and the methamphetamine distribution in count four helps to demonstrate why the May 15, 2020 memorandum is not material. See, e.g., Turner, 137 S. Ct. at 1893–95 (the materiality of alleged Brady evidence depends almost entirely on the value of the alleged Brady evidence relative to the other evidence in the case); Bartko, 728 F.3d at 338–41 (same); Rocha v. Taylor, 619 F.3d 387, 396 (5th Cir. 2010) (same); Ellis, 121 F.3d at 918 (same). Specifically, the other evidence in this case included (1) the admitted relationship as drug dealers between Velasquez and Figueroa; (2) the numerous text messages between Figueroa and Velasquez from July 6 to July 9, 2018, concerning the methamphetamine transaction; (3) the controlled telephone calls between Velasquez and Figueroa on July 9, 2018, concerning the delivery of the buy money for the pound of methamphetamine; (4) the corroboration of the methamphetamine transaction on July 8, 2018, via Rodriguez; (5) the corroboration of the methamphetamine transaction via the recovery of approximately one pound of methamphetamine from Figueroa; (6) the corroboration of the

26

methamphetamine transaction via the movements of Velasquez on July 9, 2018, including arriving at the Walmart, accepting $5200 in buy money from Velasquez for the pound of methamphetamine, and having over $10,000 in additional cash in his car which comports with someone who just received payment for selling the other pound of methamphetamine; and (7) the corroboration of the methamphetamine transaction via the testimony of Agent DiGiovanni who explained the difference in prices in 2018 for cocaine and methamphetamine, explained that methamphetamine (unlike cocaine) is sold in pound quantities, and explained how methamphetamine is packaged.

Having examined the withheld evidence in the context of the entire trial record, the court finds that there is not "a reasonable probability" that, had the May 15, 2020 memorandum been disclosed, "the result of the proceeding would have been different." Turner, 137 S. Ct. at 1893 (quotation omitted). Thus, the non-disclosed evidence is not material, and the court denies Velasquez's motion for a new trial. See id.; Bartko, 728 F.3d at 337–41.

Velasquez also asks for an evidentiary hearing. Velasquez, however, examined Fann at the sentencing hearing about the memorandum of May 15, 2020. See [D.E. 113] 13–15. Fann admitted to interviewing Figueroa on May 4, 2020, without an interpreter, and preparing the memorandum of May 15, 2020. See id. at 14. Moreover, Fann testified that during that interview Fann and Figueroa did not discuss the methamphetamine transaction or the change in the date of the delivery from July 9 to July 8, 2018. See id. at 13–15; [D.E. 100-2] (copy of memorandum of 5/15/20). Rather, they discussed cocaine dealing at Las Brasas. See [D.E. 100-2]. Figueroa did not clarify the date of the methamphetamine delivery until May 15, 2020, when the AUSA, Fann, and a translator were present. Contemporaneous correspondence confirms that Fann and the AUSA met briefly with Figueroa on May 4, 2020, but the government ended the meeting due to communication barriers with Figueroa and planned to reschedule the meeting once a translator was available. See [D.E. 110] 4;

[D.E. 110-8]; [D.E. 110-9]. As mentioned, the rescheduled meeting took place on May 15, 2020. At that meeting, Figueroa went through all the text messages with the translator and stated that Velasquez delivered the methamphetamine to him at his residence between 8:03 p.m. and 9:23 p.m. on July 8, 2018. See [D.E. 110] 5. The government promptly disclosed this impeaching information to defense counsel, and defense counsel robustly used that impeaching evidence during the trial. Unfortunately for Velasquez, the jury rejected defense counsel's arguments and found Velasquez guilty beyond a reasonable doubt. On this record, there is no need for an evidentiary hearing.

## IV.

In sum, the non-disclosed memorandum is not material, and defendant received a fair trial in compliance with due process. The verdict is worthy of confidence. Thus, defendant's motion for a new trial [D.E. 100] is DENIED. The court also DENIES defendant's motion for an evidentiary hearing.

SO ORDERED. This 14 day of April 2021.

James Dever

JAMES C. DEVER III
United States District Judge